**UNITED STATES of America,**
**Plaintiff, Appellant,**

v.

**SWISS AMERICAN BANK, LTD.,**
**et al., Defendants, Appellees.**

No. 99–1012.

United States Court of Appeals,
First Circuit.

Heard June 11, 1999.

Decided Sept. 8, 1999.

Rehearing Denied Nov. 3, 1999.

Stephen R. Heifetz, Trial Attorney, with whom Gerald E. McDowell, Chief, Asset Forfeiture and Money Laundering Section, Criminal Division, U.S. Dep't of Justice, Stefan D. Cassella, Assistant Chief, and Richard L. Hoffman, Assistant United States Attorney, were on brief, for appellant.

Howard Wilson, with whom Howard Fischer, Rosenman & Colin LLP, Michael B. Keating, Sarah Cooleybeck, and Foley, Hoag & Eliot LLP were on brief, for appellees Swiss American Bank, Ltd. and Swiss American National Bank.

William Shaw McDermott, with whom Irene C. Freidel, Edward S. Horton, and Kirkpatrick & Lockhart LLP were on brief, for appellee Bank of New York— Intermaritime Bank (Geneva).

Before SELYA, BOUDIN and LIPEZ, Circuit Judges.

SELYA, Circuit Judge.

This appeal raises issues of first impression, requiring us to delineate the circumstances under which foreign corporations may be brought before the federal courts through the medium of a recently enacted provision of the Civil Rules. In the underlying case, the government brought suit in the United States District Court for the District of Massachusetts against several foreign banking concerns in an effort to recover assets accumulated by a convicted felon and later forfeited to the government as part of a plea bargain. The district court accepted the defendants' argument that they were not within its jurisdictional reach and thus were not amenable to suit. At the same time, the court denied the government's request for jurisdictional discovery. The United States has appealed both rulings. We vacate these orders and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

We start by introducing the appellees and then turn to the forfeiture proceedings and what transpired below.

In its suit, the United States named four corporations as defendants. Two of these entities, Swiss American Bank, Limited, and Swiss American National Bank (collectively, "Swiss American" or "the Swiss American banks"), are institutions organized under the law of Antigua and Barbuda ("Antigua"), and headquartered there. A third defendant, Bank of New York–InterMaritime Bank ("IMB"), is organized under Swiss law and based in Geneva. Prior to December 28, 1987, IMB owned all the shares of the fourth defendant, Swiss American Holding Company ("SAHC"), a Panamanian corporation, and it owned at least some of SAHC's stock until December 15, 1988. Throughout that

period, the Swiss American banks were wholly-owned subsidiaries of SAHC.[1]

In mid–1993, the government entered into a plea agreement with John E. Fitzgerald. As part of this bargain, Fitzgerald pled guilty to manifold charges of engaging in a racketeering conspiracy and attempted money laundering. He simultaneously conceded that the monies on deposit in various accounts that he had opened were fruits of his criminal activity. These funds included approximately $7,000,000 that Fitzgerald had laundered through several shell corporations and eventually deposited with Swiss American between 1985 and 1987.

Notice of the impending forfeiture was published in newspapers of general circulation in both Massachusetts and Antigua. No competing claims to the funds were filed, although Swiss American informed the district court that the Antiguan government had frozen the accounts in question. The court subsequently entered a final order of forfeiture, *see* 18 U.S.C. § 1963, which decreed, *inter alia*, that "any and all interest of John E. Fitzgerald in the principal and accrued interest in the [subject] bank accounts" be "condemned, forfeited and vested in the United States." *United States v. Fitzgerald*, No. 93–10149–RWZ (D.Mass. May 4, 1994).

Despite the district court's ukase, Swiss American apparently disbursed some $5,000,000 from the subject accounts to the Antiguan authorities and confiscated the rest. The government of Antigua then took the position that, although it had not demanded that any part of Fitzgerald's assets be transferred to it, the monies it had received were no longer available to the United States. The United States responded by filing the instant action against the four defendants whom we have identified, asserting claims of conversion, unjust enrichment, and breach of contract. The defendants moved to dismiss for want of personal jurisdiction.[2] *See* Fed.R.Civ.P. 12(b)(2). The lower court agreed with the central premise of the defendants' motions, overrode the government's request for jurisdictional discovery, and dismissed the action. *See United States v. Swiss American Bank, Ltd.*, 23 F.Supp.2d 130 (D.Mass. 1998). This appeal followed.

## II. ANALYSIS

We divide our substantive discussion into four parts. We begin with the anatomy of the personal jurisdiction inquiry, in hope of providing a template for the more specific analyses that follow. We then proceed to address the government's two main jurisdictional arguments. Finally, we comment upon a separate point advanced exclusively by IMB.

### A. *Personal Jurisdiction: An Overview.*

 It is common ground that, for a court to render a binding decision consonant with due process, it must have personal jurisdiction over the parties, that is, the power to require the parties to obey its decrees. *See Burnham v. Superior Court*, 495 U.S. 604, 608–09, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990). Because a plaintiff ordinarily consents to a court's jurisdiction by filing suit, disputes over personal jurisdiction typically feature the forum court's relationship to one or more defendants. Here, the jurisdictional analysis depends

---

1. The record is tenebrous as to SAHC's litigation posture. Although the district court entered judgment in favor of all defendants, SAHC had not then been served. The government professes to have effected service shortly thereafter, but SAHC neither entered an appearance nor filed any papers. We leave this tangle for the district court to unsnarl. Accordingly, all references herein to "defendants" or "appellees" exclude SAHC.

2. The defendants also sought relief on a salmagundi of other grounds, e.g., failure to state an actionable claim, improper venue, defective service, and failure to join an indispensable party. The district court did not reach any of these issues and we leave them for initial consideration by that court.

upon whether any statute or rule authorizes the forum court to exercise its dominion over the defendants, and if so, whether the court's exercise of that jurisdiction would comport with due process.

■ The constitutional inquiry proceeds in three steps: relatedness, purposeful availment, and reasonableness.[3] *See Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 144 (1st Cir.1995). At the first stage, the court must ask whether the claim at issue arises out of or is related to the defendant's conduct within the forum state. *See id.; see also Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 206–07 (1st Cir.1994). At the second step, the court must scrutinize the defendant's contacts with the forum state to determine whether those contacts constitute purposeful activity, such that being haled into court there would be foreseeable. *See Foster–Miller*, 46 F.3d at 144; *Ticketmaster*, 26 F.3d at 207. Lastly, the Constitution imposes an overall reasonableness restraint on the exercise of personal jurisdiction. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *United Elec., Radio and Mach. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088 (1st Cir.1992). An exercise of personal jurisdiction thus complies with constitutional imperatives only if the defendant's contacts with the forum relate sufficiently to his claim, are minimally adequate to constitute purposeful availment, and render resolution of the dispute in the forum state reasonable.

■ These constitutional requirements comprise a final hurdle for an aspiring plaintiff. A court need not even consider them unless it possesses statutory authorization to exercise specific personal jurisdiction over defendants of the type that the plaintiff targets. This authorization may derive from a federal statute, *see, e.g.*, 15 U.S.C. § 22 (providing for worldwide service of process on certain corporate antitrust defendants), or from a state statute of general application, *see, e.g.*, Mass. Gen. Laws ch. 223A, § 3 (providing "long-arm" jurisdiction). A state long-arm statute furnishes a mechanism for obtaining personal jurisdiction in federal as well as state courts. *See* Fed.R.Civ.P. 4(k)(1)(A).

■ In limited circumstances, the requisite authorization can be provided by Rule 4(k)(2), quoted *infra* Part II(C), which functions as a sort of federal long-arm statute. When a plaintiff depends upon this recently adopted rule to serve as the necessary statutory authorization for the exercise of specific personal jurisdiction, the constitutional requirements are the same as those limned above, but the analytic exercises are performed with reference to the United States as a whole, rather than with reference to a particular state. The defendant's national contacts take center stage because the rule applies only to situations in which federal courts draw jurisdictional authority from the federal sovereign (unreinforced by "borrowed" state statutes), and, thus, the applicable constitutional requirements devolve from the Fifth rather than the Fourteenth Amendment. *See* Fed.R.Civ.P. 4 advisory committee note; 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1067.1 (1999 Supp.); Gary B. Born & Andrew N. Vollmer, *The Effect of the Revised Federal Rules of Civil Procedure on Personal Jurisdiction, Service, and Discovery in International Cases*, 150 F.R.D. 221, 225 (1993).

■ With this general schematic in place, we proceed to consider the govern-

---

**3.** Sometimes, a defendant's contacts with a state are so pervasive that a court in that state may exercise personal jurisdiction over it even in cases entirely unrelated to those contacts. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 n. 9, 415–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Donatelli v. National Hockey League*, 893 F.2d 459, 462–63 (1st Cir.1990). Because the government's claim in this case does not invoke this "general personal jurisdiction," we do not dwell on it.

ment's two suggested bases for the assertion of personal jurisdiction over the defendants in the District of Massachusetts: the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, §§ 3(a) & (d), and Rule 4(k)(2). Our review of the district court's ruling in this respect is plenary. *See Foster–Miller*, 46 F.3d at 147–48; *Boit v. Gar–Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir.1992); *see also Swiss American*, 23 F.Supp.2d at 133 (accepting as true the government's properly documented factual averments and evidentiary proffers).

### B. *Massachusetts Long–Arm Jurisdiction.*

Somewhat paradoxically, we begin our inquiry into the reach of the Massachusetts long-arm statute by citing the federal procedural rule that imbues it with relevance for present purposes. The rule states that:

> Service of a summons ... is effective to establish jurisdiction over the person of a defendant who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located.

Fed.R.Civ.P. 4(k)(1)(A). Because the United States sued in the District of Massachusetts, Rule 4(k)(1)(A) permits recourse to the Massachusetts long-arm statute. The government directs our attention to two subsections of that law. We mull each in turn.

**1. *Section 3(a).*** Section 3(a) of the Massachusetts long-arm statute permits courts to exercise personal jurisdiction "over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's ... transacting any business in this commonwealth." Mass. Gen. Laws ch. 223A, § 3(a). We need not linger long over this proviso. For present purposes, it suffices to say that the United States did not argue section 3(a)'s applicability below. Consequently, we may reject the government's belated claim of statutory authorization out of hand. *See Pleasant St.*, 960 F.2d at

1096 (holding that a plaintiff had waived an argument by which it attempted to salvage personal jurisdiction on appeal because it had not raised the point in the lower court); *Teamsters, Etc., Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17, 21 (1st Cir.1992) (holding that legal theories not advanced in the trial court ordinarily are deemed waived on appeal).

**2. *Section 3(d).*** Section 3(d) of the Massachusetts long-arm statute authorizes personal jurisdiction over one who causes "tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth." Mass. Gen. Laws ch. 223A, § 3(d). Although the government properly preserved its claim of jurisdiction premised on this statutory ground, the claim lacks merit for two reasons.

First and foremost, there is no showing here that the United States suffered tortious injury *in Massachusetts*. The legal injury occasioned by the tort of conversion is deemed to occur where the actual conversion takes place. *See Cycles, Ltd. v. W.J. Digby, Inc.*, 889 F.2d 612, 619 (5th Cir.1989). In this instance, the bank accounts were depleted and the forfeited assets redirected in Antigua, and, thus, the claimed injury occurred there. *See Wenz v. Memery Crystal*, 55 F.3d 1503, 1507–1508 (10th Cir.1995) (holding that, under a similar long-arm provision, the tortious injury underlying an action for conversion of funds from London accounts by London-based tortfeasors occurred in London). By like token, since the government's claim of unjust enrichment is essentially a claim for restitution based on the alleged conversion, *see Restatement of the Law on Restitution, Quasi Contracts, and Constructive Trusts* § 128 (1937), the legal injury stemming from it also must be presumed to have taken place in Antigua.

To blunt the force of this reality, the government replies that the forfeiture order was issued in Massachusetts. Fair enough—but this fact at most demonstrates that, upon the occurrence of the alleged conversion and the consequent unjust enrichment, the United States felt the effects of a tortious injury in the forum state. *See Carty v. Beech Aircraft Corp.,* 679 F.2d 1051, 1064–65 (3d Cir.1982) (collecting cases that distinguish tortious injury from the resulting economic harms). And since section 3(d) requires that the injury itself occur in Massachusetts, and does not apply merely because the plaintiff feels the effects of a tortious injury there, *see Crocker v. Hilton Int'l Barbados, Ltd.,* 976 F.2d 797, 799–800 (1st Cir.1992); *Cunningham v. Ardrox, Inc.,* 40 Mass.App.Ct. 279, 282–83, 663 N.E.2d 577 (1996); *see also Friedr. Zoellner (N.Y.) Corp. v. Tex Metals Co.,* 396 F.2d 300, 302–03 (2d Cir. 1968) (holding that a similar jurisdictional statute "is not satisfied by remote or consequential injuries [flowing from a conversion] which occurred in [the forum state]," notwithstanding that "the plaintiff is domiciled, incorporated or doing business in th[at] state"), these observations effectively end the matter.

The second reason why the government's invocation of section 3(d) misfires, involves the statutory requirement that the plaintiff must show that the defendant derived substantial revenue from services rendered in Massachusetts. In this instance, Fitzgerald (the money launderer who generated the cash) journeyed to Antigua to open the subject accounts and transferred the funds to the Swiss American banks from other foreign locations. On these facts, the government's plea reduces to an assertion that the defendants derived substantial revenue from within the commonwealth because the deposits originated with a Massachusetts resident. The statute specifies that substantial reve-

nue must be derived from services which are "rendered ... in" Massachusetts, Mass. Gen. Laws ch. 223A, § 3(d), and the residency connection, standing alone, is simply too attenuated to satisfy this benchmark. For aught that appears, any services rendered by the defendants in the instant case were rendered in Antigua.

Inasmuch as the government has not met either of the dispositive criteria for authorization of personal jurisdiction under section 3(d), we uphold the district court's ruling that personal jurisdiction cannot be premised on the Massachusetts long-arm statute. *See Swiss American,* 23 F.Supp.2d at 134.

### C. *Jurisdiction Under Rule 4(k)(2).*

The government claims, in the alternative, that the district court possessed *in personam* jurisdiction under Rule 4(k)(2). The rule, first enacted in December 1993, provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed.R.Civ.P. 4(k)(2). The rule's fabric contains three strands: (1) the plaintiff's claim must be one arising under federal law; (2) the putative defendant must be beyond the jurisdictional reach of any state court of general jurisdiction; and (3) the federal courts' exercise of personal jurisdiction over the defendant must not offend the Constitution or other federal law. Despite a suggestion that the government had waived the right to rely on Rule 4(k)(2),[4] the district court reached the

---

**4.** To the extent that the lower court saw a waiver, it was a waiver based on the government's filing of a post-hearing submission that focused exclusively on the Massachusetts long-arm statute. Any such assessment goes too far. In the typical case, filing a supplementary memorandum addressed to a particular concern raised by the trial court, without

merits of the government's claim and found it wanting on the second of these grounds. *See Swiss American,* 23 F.Supp.2d at 136. Taking our cue from the district court, we begin with this element.

### 1. *The Negation Requirement.*

By its terms, Rule 4(k)(2) requires that the putative defendant not be subject to jurisdiction in any state court of general jurisdiction. The government argues that this requirement encompasses both subject matter and personal jurisdiction, and that, therefore, it can satisfy the negation requirement simply by showing that the state courts have no subject matter jurisdiction over a particular cause of action. Building on this porous foundation, the government then argues that 28 U.S.C. § 1345—the statute under which it brought this suit—grants exclusive subject matter jurisdiction to the federal courts.[5]

We find this reasoning unconvincing. Whether or not section 1345 provides an exclusive grant of subject matter jurisdiction—a matter on which we take no view— we nonetheless consider it pellucid that Rule 4(k)(2)'s reference to defendants who are "not subject to the jurisdiction ..." refers to the absence of *personal* jurisdiction. We explain briefly.

Service is the traditional means by which a court establishes personal jurisdiction over a defendant. *See Burnham,* 495 U.S. at 610–11, 110 S.Ct. 2105. Section (k) of Rule 4 governs the circumstances in which service (or waiver of service) will suffice to confer personal jurisdiction. The rule's two subsections both speak of the means by which "jurisdiction over the person" of a defendant can be established. *See* Fed.R.Civ.P. 4(k)(1)-(2). In this setting, it strains credulity to suggest that the mention of the unmodified word "jurisdic-

tion" should be construed as anything other than a reference to "personal jurisdiction," when that understanding of the term makes reasonable sense in application (as it does here). It is, therefore, unsurprising that courts and commentators consistently have construed Rule 4(k)(2)'s allusion to the "jurisdiction" of the state courts to relate to personal jurisdiction. *See, e.g., World Tanker Carriers Corp. v. MV Ya Mawlaya,* 99 F.3d 717, 720 (5th Cir.1996); *CFMT Inc. v. Steag Microtech, Inc.,* Civ.A. No. 95–442–LON, 1997 WL 313161, at *7 (D.Del. Jan.9, 1997); *see also* Born & Vollmer, *supra,* 150 F.R.D. at 226–27; Leslie M. Kelleher, *The December 1993 Amendments to the Federal Rules of Civil Procedure—A Critical Analysis,* 12 Touro L.Rev. 7, 35 (1995).

The case law under Rule 4(k)(1) bolsters this interpretation. Under that rule, federal courts routinely have determined whether state courts would have personal jurisdiction over a defendant, even in cases of exclusive federal jurisdiction. *See, e.g., Janmark, Inc. v. Reidy,* 132 F.3d 1200, 1201 (7th Cir.1997) (commenting on the paradox of asking whether a state court would have personal jurisdiction in a federal copyright case). If the term "jurisdiction" in the text of Rule 4(k)(1) entailed subject matter as well as personal jurisdiction, the rule would never provide a means for federal courts to obtain jurisdiction over matters under exclusive federal jurisdiction. Because the two subparts of Rule 4(k) must be read in *pari materia,* this logical extension of the government's argument demonstrates its fatuity.

The advisory committee's explanation of the rationale behind the adoption of Rule 4(k)(2) cinches matters. The drafters created this proviso to deal with a gap in

---

more, should not be deemed to waive other claims. Here, there is no "more." Consequently, we treat the Rule 4(k)(2) issue as fully preserved and address it on the merits.

**5.** The statute reads in pertinent part:

Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States. . . .

28 U.S.C. § 1345.

personal jurisdiction noted by the Supreme Court in *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 111, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). Before Rule 4(k)(2) was conceived, federal courts "borrowed" from state law when a federal statute did not otherwise provide a mechanism for service of process (regardless of the state courts' subject matter jurisdiction). Accordingly, foreign defendants who lacked single-state contacts sufficient to bring them within the reach of a given state's long-arm statute (whether by reason of the paucity of the contacts or of limitations built into the statute itself), but who had enough contacts with the United States as a whole to make personal jurisdiction over them in a United States court constitutional, could evade responsibility for civil violations of federal laws that did not provide specifically for service of process. *See id.; see also* former Fed. R.Civ.P. 4(e) (superseded by the 1993 Amendments), *quoted in Omni Capital*, 484 U.S. at 105 n. 8, 108 S.Ct. 404.

██ To close this loophole, the drafters designed the new Rule 4(k)(2) to function as a species of federal long-arm statute. *See* Fed.R.Civ.P. 4 advisory committee note. The rule's final clause, restricting its application to those cases in which the putative defendant "is not subject to the jurisdiction of the courts of general jurisdiction of any state" works to cabin the rule's sweep and ensure its application only in the relatively narrow range of cases identified by the *Omni* Court (in which the states' personal jurisdiction rules prove impuissant). The government's self-serving interpretation of the term "jurisdiction," as used here, would extend the rule's scope well beyond its intended purpose and, in the bargain, would allow plaintiffs with claims falling within exclusive federal jurisdiction statutes complete discretion to forum-shop without any regard for concentrated contacts. Apart from a linguistic fortuity— the word "jurisdiction" is protean and has a wide variety of meanings, depending on the context in which it is used—there is nothing to endorse so expansive a construction of Rule 4(k)(2). We hold, therefore, that the absence of state court subject matter jurisdiction does not enter into the negation equation.

The government's better argument is that its case falls within the limits of Rule 4(k)(2) even when the rule is interpreted— as it must be—to require negation of personal jurisdiction over the defendant in any state court. The defendants' rejoinder is that, while the government alleged in its complaint that Rule 4(k)(2) supplied the necessary means for obtaining personal jurisdiction, it failed to plead or prove facts demonstrating the absence of personal jurisdiction over the defendants throughout the fifty states. This thrust and parry raises an issue of first impression concerning the order and allocation of proof in respect to Rule 4(k)(2)'s negation requirement, for no appellate court has offered a clear resolution of that problem. In a world of exponential growth in international transactions, the practical importance of this issue looms large.

██ The defendants (and the district court) certainly are correct in their insistence that a plaintiff ordinarily must shoulder the burden of proving personal jurisdiction over the defendant. *See Foster–Miller*, 46 F.3d at 145; 5A Wright & Miller, *supra*, § 1351. Some district courts, relying on this shibboleth, have assigned outright to plaintiffs the burden of proving the Rule 4(k)(2) negation requirement. *See, e.g., United States v. Offshore Marine Ltd.*, 179 F.R.D. 156, 160 (D.Vi.1998); *Dorian v. Harich Tahoe Dev.*, No. C–94–3387, 1997 WL 626109, at *2, *5 (N.D.Cal. Oct.11, 1997); *CFMT*, 1997 WL 313161, at *7–*8. This paradigm in effect requires a plaintiff to prove a negative fifty times over—an epistemological quandary which is compounded by the fact that the defendant typically controls much of the information needed to determine the existence and/or magnitude of its contacts with any given jurisdiction. There is a corre-

sponding problem with assigning the burden of proof on the Rule 4(k)(2) negation requirement to defendants: doing so threatens to place a defendant in a "Catch–22" situation, forcing it to choose between conceding its potential amenability to suit in federal court (by denying that any state court has jurisdiction over it) or conceding its potential amenability to suit in some identified state court. *See* Dora A. Corby, Comment, *Putting Personal Jurisdiction Within Reach: Just What Has Rule 4(k)(2) Done for the Personal Jurisdiction of Federal Courts?,* 30 McGeorge L.Rev. 167, 196 (1998).

Faced with such dilemmas, courts historically have tailored special burden-of-proof regimes for specific classes of cases in order to strike an equitable balance. *Cf., e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). We believe that Rule 4(k)(2) is fertile territory for such an innovation. The architects of the rule—and Congress, by adopting it—clearly intended to close the gap identified by the *Omni* Court and to ensure that persons whose contacts with this country exceeded the constitutional minimum could not easily evade civil liability in the American justice system. At the same time, however, the drafters also wrote the rule to preserve the established modalities for obtaining personal jurisdiction previously available under Rule 4(k)(1)(A) as the primary avenue to service on foreign defendants. The desire to achieve this secondary purpose led the authors of the rule to restrict its reach to those defendants with sufficient nationwide contacts to subject them to federal jurisdiction, but whose contacts were too exiguous to permit any state court to exercise personal jurisdiction over them. Viewed in this light, the application of traditional burden-of-proof principles to Rule 4(k)(2) cases not only would be inequitable, but also would shield foreign defendants who were constitutionally within the reach of federal courts from the exercise of personal jurisdiction, and, thus,

thwart the core purpose that underlies the rule.

In our view, this core purpose can be achieved much more salubriously by crafting a special burden-shifting framework. To accomplish the desired end without placing the judicial thumb too heavily on the scale, we will not assign the burden of proof on the negation issue to either party in a monolithic fashion. We prefer instead to draw upon the burden-shifting arrangement devised by the Court to cope with somewhat analogous problems of proof in the discrimination context. *See, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas,* 411 U.S. at 802–05, 93 S.Ct. 1817. We etch the contours of this proposed standard in detail below.

We hold that a plaintiff who seeks to invoke Rule 4(k)(2) must make a prima facie case for the applicability of the rule. This includes a tripartite showing (1) that the claim asserted arises under federal law, (2) that personal jurisdiction is not available under any situation-specific federal statute, and (3) that the putative defendant's contacts with the nation as a whole suffice to satisfy the applicable constitutional requirements. The plaintiff, moreover, must certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state. If the plaintiff makes out his prima facie case, the burden shifts to the defendant to produce evidence which, if credited, would show either that one or more specific states exist in which it would be subject to suit or that its contacts with the United States are constitutionally insufficient. *See generally* Stephen B. Burbank, *The United States' Approach to International Civil Litigation: Recent Developments in Forum Selection,* 19 U. Pa. J. Int'l Econ. L. 1, 13 (1998) (suggesting a broad outline for a similar burden-shifting

regime vis-à-vis the Rule 4(k)(2) negation requirement). Should the defendant default on its burden of production, the trier may infer that personal jurisdiction over the defendant is not available in any state court of general jurisdiction. If, however, the defendant satisfies its second-stage burden of production, then the aforementioned inference drops from the case.

What happens next depends on how the defendant satisfies its burden. If the defendant produces evidence indicating that it is subject to jurisdiction in a particular state, the plaintiff has three choices: he may move for a transfer to a district within that state, or he may discontinue his action (preliminary, perhaps, to the initiation of a suit in the courts of the identified state), or he may contest the defendant's proffer. If the plaintiff elects the last-mentioned course, the defendant will be deemed to have waived any claim that it is subject to personal jurisdiction in the courts of general jurisdiction of any state other than the state or states which it has identified, and the plaintiff, to fulfill the negation requirement, must prove that the defendant is not subject to suit in the identified forum(s).

Of course, the defendant may satisfy its burden of production by maintaining that it cannot constitutionally be subjected to jurisdiction in any state court. In that event, the defendant will be deemed to have conceded the negation issue, and the plaintiff, to succeed in his Rule 4(k)(2) initiative, need only prove that his claim arises under federal law and that the defendant has contacts with the United States as a whole sufficient to permit a federal court constitutionally to exercise personal jurisdiction over it.

We think that this schematic fairly balances the equities and comports with congressional intent, particularly since we envision the defendant's burden as a burden of production only. The plaintiff at all times retains the devoir of persuasion on the ultimate issue. *Cf. St. Mary's Honor*

*Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742. And while the burden-shifting framework puts defendants in an admittedly uncomfortable litigating position, that is to some degree the object of Rule 4(k)(2).

We return at this point to the proceedings below. Following the traditional rule, the trial court assigned the burden of proving negation to the plaintiff outright, *see Swiss American*, 23 F.Supp.2d at 133, 135, and dismissed the complaint when the government failed to plead or proffer evidence anent the defendants' lack of jurisdictionally meaningful contacts throughout the fifty states, *see id.* at 135–36. Given our holding that the Rule 4(k)(2) negation requirement evokes a modified burden-of-proof regime, that order of dismissal cannot stand unless dismissal is justified on some ground apart from negation. *See Hachikian v. FDIC*, 96 F.3d 502, 504 (1st Cir.1996) (holding that the court of appeals is not constrained by the trial court's reasoning, but may affirm a judgment on any independent ground made manifest by the record).

In this posture of the case, we look first to the other two strands of Rule 4(k)(2). One of these proves too recondite to consider at this juncture: the record in this case is not sufficiently developed to permit reasoned consideration of whether the federal courts' exercise of personal jurisdiction over these defendants would offend the Constitution. *See infra* Part II(C)(3). By default, then, we focus on the defendants' argument that the government's claim does not arise under federal law.

**2. *"Arising Under" Federal Law.*** We begin with bedrock: a case in which the rule of decision must be drawn from federal common law presents a uniquely federal question, and, thus, comes within the original subject matter jurisdiction of the federal courts. *See National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985); *Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); *see also* 19 Wright,

Miller & Cooper, *supra*, § 4514: Here, the United States seizes upon this principle in an effort to fulfill Rule 4(k)(2)'s "arising under" requirement. It argues vigorously that its case is founded on, and should be decided according to, federal common law. The defendants demur. They contend that this is a garden-variety tort and/or breach of contract case, governed by state law.

■ There are good arguments on both sides. On the one hand, it is beyond cavil that federal common law sometimes may be fashioned by federal courts to protect the proprietary interest of the federal sovereign. *See* Erwin Chemerinsky, *Federal Jurisdiction* 336, 340–44 (2d ed.1994). On the other hand, it is equally true that the power to create federal common law should be used sparingly, so as not to intrude upon areas like tort and contract that are traditionally within the states' bailiwick. To decide which tenet predominates here, we must go behind these generalities.

The seminal case in this arcane corner of the law is *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). *Clearfield* involved a check issued by the United States and fraudulently cashed by someone other than the payee. *See id.* at 364–65, 63 S.Ct. 573. When the fraud was discovered, the United States sued the bank that had successfully presented the check to the Federal Reserve for payment. The district court found that, under state law, the United States had delayed too long in notifying the bank of the forgery and held that its claim was barred. *See id.* at 366, 63 S.Ct. 573. The court of appeals, applying federal common law, reversed. *See id.* The Supreme Court agreed, declaring:

> The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. . . . The authority to issue the

check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of [the state at issue] or of any other state. The duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same federal sources.

*Id.* at 366, 63 S.Ct. 573 (citations and footnote omitted). Since *Clearfield*, courts often have looked to federal common law to protect various proprietary interests of the United States. Thus, in *United States v. Standard Oil Co.*, 332 U.S. 301, 305, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947), the Justices held that the existence of a cause of action for the government's loss of a soldier's services due to tortious injury was a matter of federal, not state, law. Echoing *Clearfield*, 318 U.S. at 367, 63 S.Ct. 573, the Court emphasized the desirability of a uniform rule of federal law, in lieu of the patchwork that would result from a piecemeal adoption of state law. *See Standard Oil*, 332 U.S. at 310–11, 67 S.Ct. 1604.

■ Later cases and many commentators indicate that the proper mode of analysis for questions of this kind is binary. *See, e.g., United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–29, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592–95, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973); Chemerinsky, *supra*, at 337–40; Wright, Miller & Cooper, *supra*, § 4514. This two-part approach involves what may be characterized as the source question and the substance question. The former asks: should the source of the controlling law be federal or state? The latter (which comes into play only if the source question is answered in favor of a federal solution) asks: should the court, in defining the substance of the rule to be applied in the particular situation, adopt state law as a proxy for an independent federal common law rule, or alternatively, fashion a uniform federal rule?

In the vast majority of cases that raise the possibility of creating federal common law, the bone of contention is whether a particular rule drawn from state law will be applied to affect a federal interest, directly or indirectly. In such cases, courts that would resolve the substance question in favor of adopting state law typically find it unnecessary to resolve the source question explicitly.[6] *See, e.g., O'Melveny & Myers v. FDIC,* 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *United States v. Yazell,* 382 U.S. 341, 357, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966). Here, however, the path of least resistance is not open to us. This appeal turns on the resolution of the source question. Unless we find that the appropriate source of law is federal, the case is not one in which Rule 4(k)(2) can authorize the exercise of personal jurisdiction over the defendants. Conversely, if the appropriate legal source is federal, that ends our inquiry for Rule 4(k)(2) purposes, and the answer to the substance question can be deferred.

■■■■ There is remarkably little law that illumines the reasons for deciding the source question one way or the other. We believe it is inevitable, however, that the key determinant must be the strength of the relevant federal interest. *See Standard Oil,* 332 U.S. at 305–06, 67 S.Ct. 1604. The government touts the federal interest here as having multiple dimensions, *e.g.,* protecting its property interest in funds forfeited in consequence of a federal criminal prosecution, validating an order of a federal court, and safeguarding federal hegemony in foreign affairs. The most commonplace of these is the government's

property interest. That type of federal interest formed the basis for the invocation of a federal source in cases such as *Kimbell Foods,* 440 U.S. at 726–27, 99 S.Ct. 1448, and *Clearfield,* 318 U.S. at 366–67, 63 S.Ct. 573. This type of interest also led the Court to designate a federal source of law for construing government contracts. *See United States v. Seckinger,* 397 U.S. 203, 209–10 & n. 13, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). The other interests that the government cites, though less prevalent in the "source question" context, lend added weight. *See generally Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (discussing the importance of "vindicat[ing] the jurisdiction and authority of courts to enforce [their] orders"); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 425, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (discussing federal government's exclusive power to control the foreign relations of the United States).

The defendants assert that these interests, singly or in combination, do not justify the designation of a federal source here. They note that the use of federal common law has been rejected in civil forfeiture actions. *See United States v. 2525 Leroy Lane,* 910 F.2d 343, 347–49 (6th Cir.1990); *United States v. 15621 S.W. 209th Ave.,* 894 F.2d 1511, 1517–20 (11th Cir.1990). Assuming that this assertion is accurate as far as it goes, *but see United States v. 1500 Lincoln Ave.,* 949 F.2d 73 (3d Cir.1991), it nevertheless does not go very far. Generally speaking, the cases cited by the defendants stand for the proposition that, in a civil forfeiture proceeding, the property

---

**6.** The Supreme Court seemingly back-pedaled from the two-part framework in *Boyle v. United Techs. Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). There, the Court used the terminology of "displacement of state law" and "preemption" in determining whether federal law should provide government contractors with immunity from certain state-law product liability actions. *See id.* at 504–05, 108 S.Ct. 2510. Justice Scalia, writing for the majority, preferred these terms to "adoption" or "borrowing" of state law

because he saw "nothing to be gained by expanding the theoretical scope of the federal pre-emption beyond its practical effect." *Id.* at 507 n. 3, 108 S.Ct. 2510. Be that as it may, *Boyle* does not suggest any refinement in the framing of the source question. For that matter, it does not counsel abandonment of the archetypical two-part framework in cases, like this one, in which the use of that framework promises to make a practical difference. *See id.*

interest that the federal government may obtain will be defined and circumscribed by state property law. *See, e.g., 2525 Leroy Lane,* 910 F.2d at 349. Thus for example, when spouses hold property as tenants by the entirety, the forfeiture of one spouse's interest in that property is subject to the usual restrictions imposed by state law on such tenancies. *See id.* at 350–51. The resolution of such issues has little, if any, bearing on the source question in this case.

Next, the defendants posit that state law is perfectly adequate to protect the federal sovereign in this sort of situation. To fortify this thesis, they observe that the government itself occasionally has turned to state law to protect property obtained by forfeiture. *See, e.g., United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d 660, 664 (4th Cir.1996). This thrust also misses the mark. Arguments about the ability of state law to protect federal interests are relevant to the substance question, not the source question. It is the substance question—and only this substance question—that requires consideration of the need for a uniform federal rule versus the efficiency and predictability gains furthered by applying state law. *See, e.g., Kimbell Foods,* 440 U.S. at 728–29, 99 S.Ct. 1448. Consequently, the defendants' importunings about the suitability and ready availability of state law do not inform a proper resolution of the source question. With regard to that question, the salient consideration is not whether state law has the capacity adequately to protect the federal interest, but, rather, whether the ascertained federal interest necessitates a federal source for the rule of decision.

In this respect, we find that *Clearfield* constitutes an instructive parallel. Here, as in *Clearfield,* 318 U.S. at 365, 63 S.Ct. 573, the United States seeks to recoup its funds from an alleged converter. In *Clearfield* the authority of the United States to issue the check originated in federal law, uninfluenced by the laws of the state in which the forgery occurred. *See id.* at 366, 63 S.Ct. 573. Here, similarly, the authority of the United States to gain title to the disputed funds flows from its federal-law power to punish criminals, including its right to require forfeiture of racketeering proceeds, *see* 18 U.S.C. § 1963, and state law has no direct bearing on this authority. Pondering such considerations, the *Clearfield* Court concluded that the rights acquired by the United States should be determined by reference to a federal source. *See Clearfield,* 318 U.S. at 366–67, 63 S.Ct. 573. We follow this lead and hold that, when the United States sues to assert its rights against an alleged converter to recoup assets (or obtain the value of assets) forfeited to it, the rights that it has acquired find their roots in, and must be adjudicated in accordance with, a federal source. On this basis, we answer the source question in favor of federal law.

Having resolved the source question, we need not pursue this inquiry further. As long as the source of the rule to be applied is federal, the government has demonstrated that its case is one "arising under" federal law, and that element of the Rule 4(k)(2) calculus has been fulfilled. For present purposes, therefore, the answer to the source question suffices, regardless of what the answer to the substance question eventually may prove to be.

■ **3. Adequacy of Contacts.** In addition to satisfying the negation and "arising under" requirements, the government must make one additional showing to gain access to Rule 4(k)(2): that the defendants have adequate contacts with the United States as a whole to support personal jurisdiction and that an assertion of jurisdiction over them would be reasonable. The government tried to make this showing below, but requested jurisdictional discovery to permit it to marshal the necessary proof. A timely and properly supported request for jurisdictional discovery merits solicitous attention. *See Sunview Condo. Ass'n v. Flexel Int'l, Ltd.,* 116

F.3d 962, 964 (1st Cir.1997) (explaining that "a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of *in personam* jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense"); *see also Boit,* 967 F.2d at 680–81; *Surpitski v. Hughes–Keenan Corp.,* 362 F.2d 254, 255–56 (1st Cir.1966) (per curiam). The government claims that it fits within the *Sunview* rule. The defendants disagree. They asseverate that, especially in light of the government's lengthy pre-litigation investigation of them, its weak case for personal jurisdiction fails to clear even this relatively low barrier.

The district court denied the motion for limited discovery on the ground that the government had failed to negate state court jurisdiction. Our holding today, *see supra* Part II(C)(1), undermines the rationale for the district court's decision. We therefore vacate the denial of the government's motion for jurisdictional discovery. On remand, the court must reevaluate the government's request.

### D. *Alter Ego Theory.*

In addition to moving for dismissal for lack of personal jurisdiction, Fed.R.Civ.P. 12(b)(2), IMB moved for dismissal (or, alternatively for summary judgment) on the merits, *see* Fed.R.Civ.P. 12(b)(6), 56. It asserts that, if the district court's jurisdictional assessment went awry, we should affirm the order of dismissal on the merits. Since IMB's alternative motion rests on affidavits and other material outside the pleadings, we need consider only its entitlement *vel non* to summary judgment. *See Collier v. City of Chicopee,* 158 F.3d 601, 603 (1st Cir.1998); *see also* Fed.R.Civ.P. 12(b).

The substance of IMB's argument is that it cannot be held liable for Swiss American's misconduct because, contrary to the government's allegations, it is not Swiss American's alter ego. In IMB's view, alter ego liability cannot attach under Massachusetts law without a showing that (1) IMB pervasively controlled SAHC, which in turn pervasively controlled the Swiss American banks (or that the activities of the corporations were confusingly intermingled with substantial disregard for corporate separateness), and (2) that it is necessary to pierce the corporate veil in order to forestall a miscarriage of justice or other gross inequity.[7] *See, e.g., Birbara v. Locke,* 99 F.3d 1233, 1238–39 (1st Cir. 1996); *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 620, 233 N.E.2d 748 (1968). In support of this plea, IMB emphasizes that such a state of affairs could not be shown to exist because it transferred its stock in SAHC to an unrelated entity in 1988, while the allegedly wrongful acts did not take place until 1993 (at the earliest).

This argument is premature. The Supreme Court's recent exhortations to decide issues of jurisdiction—both personal and subject matter—before reaching the merits of a case suggest to us that consideration of IMB's summary judgment motion should await a determination of the district court's jurisdiction over IMB. *See generally Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 1012, 1016, 140 L.Ed.2d 210 (1998) (holding that issues of subject matter jurisdiction ordinarily should be decided before the merits); *id.* 118 S.Ct. at 1020 (O'Connor, J. concurring) (similar); *cf. Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 119 S.Ct. 1563, 1567, 143 L.Ed.2d 760 (1999) (holding that there is no hierarchy in the order of decision of issues of personal and subject matter jurisdiction). The lack of a developed record and the fact that the district court has not yet expressed its views on this motion are added considerations that point us in the same direction. Consequently, we decline to rule on IMB's mo-

---

7. It has not yet been determined whether Massachusetts substantive law will govern the claims at issue in this case, so to that extent IMB's argument is presumptuous.

tion for summary judgment at the present time.

## III. CONCLUSION

We need go no further. We agree with the district court that the government made an insufficient showing of personal jurisdiction over the defendants to engage the gears of the Massachusetts long-arm statute as incorporated by Rule 4(k)(1)(A), and to that extent we affirm the court's rulings. We disagree, however, with the court's approach to Rule 4(k)(2)'s negation requirement and view the question of whether Rule 4(k)(2) can be used here as open. Accordingly, we vacate the order of dismissal and remand for further proceedings consistent with this opinion. We also vacate the order denying jurisdictional discovery and remand for reconsideration of that matter. We intimate no view as to the eventual outcome of the resumed proceedings below.

*Affirmed in part; vacated in part; and remanded. All parties will bear their own costs.*