Kenneth V. HACHIKIAN,
Plaintiff, Appellant,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, Defendant,
Appellee.

No. 96–1230.

United States Court of Appeals,
First Circuit.

Heard July 30, 1996.

Decided Sept. 13, 1996.

W. Paul Needham, Boston, MA, with whom Kevin Hensley, West Roxbury, MA,

and Needham & Warren, Boston, MA, were on brief, for appellant.

Karen A. Caplan, Boston, MA, with whom Ann S. Duross, Richard J. Osterman, Jr., Clark Van Der Velde, Franklin, MA, and Thomas R. Paxman, Boston, MA, were on brief, for appellee.

Before SELYA, Circuit Judge, TORRES* and SARIS,** District Judges.

SELYA, Circuit Judge.

Plaintiff-appellant Kenneth V. Hachikian seeks to enforce, or in the alternative to obtain damages for the breach of, an oral agreement that he allegedly made with defendant-appellee Federal Deposit Insurance Corporation (FDIC). The district court dashed his hopes by granting the FDIC's motion for summary judgment. The court reasoned that, even if a contract had been formed, it violated the statute of frauds. We affirm, albeit on a different ground.

## I. BACKGROUND

Adhering to the familiar praxis, we recite the pertinent facts in the light most favorable to the party who unsuccessfully resisted summary judgment.

In his halcyon days the appellant borrowed liberally from two Massachusetts-based financial institutions: Olympic Bank and Bank Five for Savings. At the times relevant hereto the Olympic debt consisted of (i) a $200,000 promissory note secured by a third mortgage on the appellant's residence, (ii) a $115,000 promissory note secured by a pledge of shares in Chestnut Hill Bank & Trust Co. (the CHBT stock), and (iii) personal guarantees of two business loans which totaled over $3,100,000. The Bank Five debt consisted of (i) a $168,750 loan secured by a fourth mortgage on the appellant's residence, and (ii) a personal guarantee of a business loan having a deficiency balance of approximately $500,000. As luck would have it, both

banks foundered. In each instance the FDIC (a government agency operating under federal statutory authority, *see, e.g.,* 12 U.S.C. §§ 1814–1883 (1994)) was appointed as the receiver. It administered the Olympic receivership from its Westborough, Massachusetts consolidated office (WCO) and the Bank Five receivership from its Franklin, Massachusetts consolidated office (FCO).

With the specter of personal bankruptcy looming, the appellant commenced negotiations for the settlement of his debts. His attorney, Michael McLaughlin, wrote several letters to Kathy Callen, a WCO account officer. After months of haggling over possible settlement models, McLaughlin received a telephone call from Callen on June 3, 1993, in which she stated that her agency had approved the appellant's latest proposal. The next day, McLaughlin wrote to Callen outlining the details of the bargain that he believed had just been struck: in exchange for a release of the appellant's indebtedness to both Olympic and Bank Five and the discharge of the third and fourth mortgages that encumbered his residence, the appellant agreed to (i) pay the FDIC $17,500 in cash, (ii) transfer to it the CHBT stock, and (iii) sell his residence and remit the net sale proceeds (estimated to be in excess of $100,-000). The FDIC did not respond immediately to McLaughlin's communique, but it later asserted (before any performance took place) that, while it had approved a settlement paradigm, it had never assented to, and Callen had never acquiesced in, the settlement described by McLaughlin.[1]

By October of 1993 the appellant knew that the FDIC refused to abide by the terms that McLaughlin said constituted the agreed settlement. In November, the appellant proposed a new, more circumscribed agreement. This proposal envisioned that the FDIC would discharge the two mortgages that it held on the appellant's residence in return for the net proceeds derived from a sale of

---

* Of the District of Rhode Island, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

1. Although the FDIC did not contemporaneously provide the appellant with a written description

of the terms that in fact had been approved on June 3, 1993, it told the appellant's counsel that the sanctioned settlement called solely for the discharge of the indebtedness administered through the WCO, i.e., the appellant's obligations to Olympic.

that property. The appellant characterized this proposal as being in mitigation of the damages stemming from the FDIC's "breach" of the earlier "settlement agreement."

Peter Frazier, Callen's replacement as the WCO account officer responsible for supervising the appellant's debts, responded to the new proposal by letters dated November 30 and December 21, respectively. The letters stated in substance that while the FDIC agreed to release the third and fourth mortgages on the appellant's residence in exchange for the avails of the anticipated sale, the proceeds would merely be credited to the appellant's account and the excess indebtedness would remain "open and payable in full." Against this contentious backdrop, the FDIC discharged both mortgages in December of 1993; the appellant sold his home; and the FDIC received net sale proceeds of approximately $103,000.

In January of 1994, the appellant's attorney again wrote to the FDIC, reiterating his view that the December transaction was accomplished merely as a means of mitigating the damages caused by the FDIC's repudiation of the earlier (June 1993) pact. He also demanded that the FDIC cancel all the appellant's notes and guarantees. The agency refused to grant a global release. In short order, the appellant sued in federal district court seeking money damages, specific performance, and a declaratory judgment upholding the supposed June 1993 agreement.

The FDIC denied the material allegations of the complaint and moved for *brevis* disposition. It argued, among other things, that the district court lacked jurisdiction because the appellant had failed to comply with the administrative claims review process; that no agreement came into being in June of 1993 because there had been no meeting of the minds; that, regardless of what Callen may have stated, it never had approved the settlement terms chronicled by McLaughlin; and that, even if an oral contract had been formed, it was unenforceable under the statute of frauds. The district court rejected the FDIC's jurisdictional argument[2] but determined that the oral contract violated the

statute of frauds, Mass. Gen. L. ch. 259, § 1 (1996), and granted judgment accordingly. *See Hachikian v. FDIC*, 914 F.Supp. 14, 17 (D.Mass.1996). This appeal ensued.

## II. ANALYSIS

■■■ The Civil Rules provide that summary judgment may flourish when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On appeal from the entry of summary judgment we review the district court's decision de novo, construing the record in the light most congenial to the nonmovant and resolving all reasonable inferences in that party's favor. *See Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994). We are not wed to the lower court's rationale, but may affirm the entry of summary judgment on any alternate ground made manifest by the record. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48–49 (1st Cir.1990); *Polyplastics, Inc., v. Transconex, Inc.*, 827 F.2d 859, 860–61 (1st Cir.1987).

■■■ The statute of frauds question is freighted with com-plexity, *see generally* Restatement (Second) of Contracts § 147(2) (1979) (explaining that when the duty to perform those "promises in a contract which subject it to the [statute of frauds] ... has been discharged," the statute of frauds "does not prevent enforcement of the remaining promises"), and we need not reach it here. The short answer to the appellant's importunings is that the purported agreement on which the appellant bases his suit never came into being. To be sure, the FDIC approved a potential settlement on June 3, 1993—but the agency's records conclusively demonstrate that the contemplated settlement involved only that portion of the appellant's indebtedness that came under the aegis of the WCO. The appellant has not shown (and, indeed, does not aver) that the FDIC duly authorized a global settlement of his aggregate (i.e., WCO plus FCO) indebtedness. He claims only that a representative of the FDIC—Callen—assured his attorney that such a settlement had been approved by the

---

2. The FDIC has not pursued this issue on appeal, and we take no view of it.

appropriate plenipotentiaries within the agency. Even assuming, as we must, the accuracy of the appellant's version of Callen's statement, this is simply too porous a foundation on which to posit liability on the part of a government agency.

 Dealing with the sovereign brings to bear a special set of rules that are more demanding than those that apply when one deals with a private party. *See, e.g., Rock Island, Ark. & La. R.R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920) (Holmes, J.) (warning that citizens "must turn square corners when they deal with the Government"). Thus, for example, parties seeking to recover against the United States in an action *ex contractu* have the burden of demonstrating affirmatively that the agent who purported to bind the government had actual authority to do so. *See H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989). This rule is dispositive here.

The FDIC's board of directors is permitted by statute to authorize agents and employees to exercise the powers granted to the agency by Congress. *See* 12 U.S.C. § 1819(a). The FDIC asserts without contradiction that its board passed a resolution concerning the delegation of authority to dispose of corporate assets (like the debts Hachikian owed to failed banks and which were inherited by the FDIC *qua* receiver), and that this resolution was in effect at all relevant times. By its terms, the resolution delegates authority to a Credit Review Committee (CRC) to approve the settlement of debts on the order of magnitude owed by the appellant. In contrast, the resolution cedes no authority to account officers (such as Callen) to approve such settlements. This description of the settlement-approving process is uncontradicted, and, in fact, the appellant admits that Callen had no authority to approve a settlement herself. He also acknowledges that he understood all along that only the CRC could accept his settlement offer and bind the agency to it. On a record that is barren of *any* evidence that the CRC approved a settlement embodying a global release of the appellant's obligations, no reasonable factfinder could conclude that the purported agreement on which the appellant's claim depends ever materialized.

Perusing the record in the light most flattering to the appellant, we are left with this scenario: on June 3, 1993, the CRC approved a settlement applicable only to the indebtedness managed by the WCO for the consideration limned by McLaughlin, and on the same day Callen mistakenly informed McLaughlin that the CRC had approved a global settlement that included the debts administered through both the WCO and the FCO. This scenario cannot support a breach-of-contract claim because the CRC (and, hence, the FDIC) never accepted the terms offered by the appellant.

██ Nevertheless, the appellant has a fallback position: Callen, he says, may have lacked actual authority to compromise debts but she had actual authority to communicate the CRC's wishes to debtors. The government is therefore bound, this thesis runs, by her communication. The thesis will not wash. Callen's miscommunication of the CRC's position could not bind the FDIC inasmuch as the federal government may only be bound by officials vested with lawful authority to do so. As the Court has held:

> [C]ontracts, express or implied, may be judicially enforced against the Government of the United States. But such a liability can be created only by some officer of the Government lawfully invested with power to make such contracts or to perform acts from which they may be lawfully implied.

*Eastern Extension, Australasia & China Tel. Co. v. United States,* 251 U.S. 355, 366, 40 S.Ct. 168, 172, 64 L.Ed. 305 (1920).

██ Nor can the appellant rewardingly rely on Callen's authority to communicate the CRC's decisions to debtors as the tie that binds the FDIC to the global settlement. Callen's authority was restricted to communicating what the CRC in fact decided. Though her mistaken communication may well have seemed to be authorized at the time, the upshot of the web of legal rules requiring proof of a government actor's actual authority is that apparent authority cannot serve as a means of holding the federal sovereign to a contract. The Supreme Court

succinctly stated this principle of contract formation:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.

*Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). This means that if the federal actor did not possess actual authority, the claimed contract fails. *See, e.g., United States v. Beebe,* 180 U.S. 343, 351–55, 21 S.Ct.˙ 371, 374–76, 45 L.Ed. 563 (1901); *Urso v. United States,* 72 F.3d 59, 60 (7th Cir.1995); *CACI, Inc. v. Stone,* 990 F.2d 1233, 1236 (Fed.Cir.1993); *Prater v. United States,* 612 F.2d 157, 160 (5th Cir.1980). So it is here.

■■■ If more were needed—and we doubt that it is—policy rationales for this rule can be extrapolated from the closely related theory that equitable estoppel is generally inapplicable to the federal government when its employees induce reliance by their unauthorized actions.[3] *See, e.g., Merrill,* 332 U.S. at 384–85, 68 S.Ct. at 3–4. Judicial enforcement of unauthorized contracts would "expand the power of federal officials beyond specific legislative limits," thereby raising serious separation of powers concerns. *Falcone v. Pierce,* 864 F.2d 226, 229 (1st Cir. 1988). Furthermore, enforcing such agreements would put the public purse at undue risk. *See id.* (explaining that "in order to protect the resources essential to maintain government for all people, it may be necessary in some instances to deny compensation

to individuals harmed by government misconduct").

## III. CONCLUSION

We need go no further.[4] Not only did Callen lack actual authority to bind the FDIC, but the appellant understood that reality throughout the negotiations. In the absence of any significantly probative evidence either that the delegation of authority extended further than the documentary submissions show, or that the CRC approved a global settlement, the "contract" on which the appellant sues is nothing more than wishful thinking.

*Affirmed.*

---

**3.** In all events, estoppel is not a viable alternative here. In the first place, the appellant expressly disclaimed any reliance on an estoppel theory. In the second place, estoppel as a means of binding the federal government to unauthorized agreements has been almost universally rejected. *See, e.g., Utah Power & Light Co. v. United States,* 243 U.S. 389, 408–09, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); *FDIC v. Roldan Fonseca,* 795 F.2d 1102, 1107–08 (1st Cir.1986); *Phelps v. FEMA,* 785 F.2d 13, 17 (1st Cir.1986).

**4.** The FDIC contests the federal courts' subject matter jurisdiction over the appellant's claims for equitable relief, e.g., specific performance. Its objection is premised on 12 U.S.C. § 1821(j), a statute that, with certain exceptions not relevant

here, prohibits courts from "tak[ing] any action ... to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or receiver." Since "[i]t is a familiar tenet that when an appeal presents a jurisdictional quandary, yet the merits of the underlying issue, if reached, will in any event be resolved in favor of the party challenging the court's jurisdiction, then the court may forsake the jurisdictional riddle and simply dispose of the appeal on the merits," *United States v. Stoller,* 78 F.3d 710, 715 (1st Cir.1996) (collecting cases), *petition for cert. filed,* 64 U.S.L.W. 3823 (May 29, 1996) (No. 95–1936), we leave the FDIC's jurisdictional argument for another day.