Thomas R. BATEMAN, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, Defendant.

No. CIV. A. 99–11191–MEL.

United States District Court,
D. Massachusetts.

Aug. 22, 2000.

Matthew J. Matule, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Plaintiff.

John Foskett, Lawrence R. Holland, Berin Sultan, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

LASKER, District Judge.

Thomas R. Bateman sues the Federal Deposit Insurance Corporation for breach of contract, breach of implied covenant of good-faith and fair dealing, specific performance and declaratory judgment. The claims arise primarily from oral agreements Bateman alleges to have entered into with the FDIC in its capacity as receiver of Malden Trust Company and relate to the settlement of his obligations under a "Replacement Promissory Note." Bateman moves to amend his complaint to add claims for intentional and negligent misrepresentation, deceit and promissory estoppel. The FDIC opposes the motion and moves for summary judgment on the complaint. The FDIC also moves for the imposition of Rule 11 sanctions in connection with the filing of this action and the motion to amend. Bateman's motion to amend is denied. The FDIC's motion for summary judgment is granted and the complaint is dismissed. The FDIC's motion for sanctions is denied.

## I.

Bateman executed the Replacement Promissory Note (the "Note") in the amount of $1,680,000, which was originally payable to Spring Realty Trust, on January 24, 1992. At the time, Spring Realty Trust was a partner of Weston Realty Corporation, a company controlled by Bateman, in a real estate development partnership. On September 17, 1996, Spring Realty Trust endorsed the Note in favor of the FDIC. The FDIC had been appointed receiver of Malden Trust Company and the endorsement was part of a settlement of Spring Realty Trust's outstanding loan obligations to Malden Trust Company.

Bateman alleges that the FDIC on at least three occasions agreed to sell the Note back to him at a stipulated price, and that the FDIC reneged on each of these agreements and instead offered the Note in a package of notes at public sale. According to Bateman, his attorney, Jerry Peppers, began negotiating, on Bateman's behalf, with the FDIC to repurchase the Note in January 1997. Bateman contends that, on February 4, 1997, Vincent Leal, an FDIC Credit Specialist, on behalf of the FDIC, agreed to sell the Note to Bateman for $296,500. In reaching this agreement, Bateman claims that there was no mention of any further approvals by the FDIC's Credit Review Committee (the "CRC") as a condition precedent to this agreement.

Bateman claims that shortly thereafter Leal contacted Peppers to say that he had made a mistake in his valuation calculation and could not approve the sale for less than $346,500. Bateman alleges that, on February 11, 1997, Peppers telephoned Leal and accepted the FDIC's offer at the new price of $346,500. Bateman further asserts that this acceptance was "confirmed" in a February 20, 1997 letter from Peppers to Leal and that there was no mention of CRC approval being required at this time either.

According to Bateman, Leal never responded to Pepper's February 20 letter. Instead, on April 14, 1997, Leal sent Bateman a form letter notifying Bateman that the FDIC planned to sell the Note as part of a package of notes to a third party. The letter also informed Bateman that "the FDIC [would] consider an offer to resolve your obligation, should you choose to make a proposal" and that "[a]ll offers or agreements are subject to approval by the proper delegation [sic] of authority within the FDIC." It stated further that in order for such an offer to be considered by the FDIC, Bateman was required to provide financial statements, tax returns and an affidavit of indebtedness.

Upon receiving the April 14 letter, Peppers wrote to Leal on April 22, 1997 inquiring about the status of the alleged agreement at the price of $346,500. Peppers also attempted to contact Leal by telephone on at least five occasions during the course of the next several months. Bateman further alleges that when Peppers finally did reach Leal, Leal stated that the FDIC's Credit Committee's formula for determining the present value of the Note required a purchase price of $521,661. Peppers then conferred with Bateman and Bateman subsequently agreed to this revised purchase price.

Confirmation of Bateman's acceptance of the $521,661 purchase price was set forth in a letter from Peppers to Leal dated June 25, 1997. In the letter, Peppers also indicated his understanding "that Committee approval would be required" and that Leal "expect[ed the approval] to be forthcoming on 3 July." The letter makes no mention of any requirement that Bateman supply financial statements, tax returns or an affidavit of indebtedness.

Notwithstanding these discussions between Leal and Peppers, Bateman subsequently received a letter, dated July 13, 1997, from Leal notifying Bateman that the FDIC again planned to include the Note in a package sale. However, on November 8, 1997, Leal informed Peppers that the package containing Bateman's Note was not sold. Leal also told Peppers that the FDIC was willing to continue discussions with Bateman regarding Bateman's intention to repurchase the Note. Before any agreement was consummated, however, Peppers was informed that Leal was no longer employed by the FDIC. Over the next several months Peppers had discussions with at least two other FDIC credit specialists in connection with Bateman's efforts to repurchase the Note. None of these discussions were successful.

On March 17, 1999, the FDIC sued Bateman for failure to pay the interest payments due on the Note. That suit was voluntarily dismissed on April 9, 1999 after Bateman agreed to pay $200,000 in past

due interest payments. Since then, according to the Complaint, the FDIC has "refuse[d] to consummate—or even resume negotiations—regarding its agreement to sell the Note to Mr. Bateman." On June 1, 1999, Bateman commenced this action.

## II.

### A. *Bateman's Motion to Amend the Complaint*

Bateman moves to amend the complaint to add counts for intentional and negligent misrepresentation, deceit and promissory estoppel. Fed.R.Civ.P. 15 provides that leave to amend the complaint "shall be freely given when justice so requires." Nevertheless, a motion to amend is denied where an amendment would be legally futile or would serve no legitimate purpose. *Judge v. City of Lowell,* 160 F.3d 67, 79 (1st Cir.1998).

Bateman alleges that, after the complaint was filed, he learned through discovery that despite Leal's representations to Bateman that the purported oral agreements would be presented to the FDIC's Credit Review Committee and that approval would be "forthcoming," Leal never presented the agreements for final approval. Accordingly, Bateman contends that leave to amend is warranted under the circumstances and will not cause prejudice to the FDIC.

The FDIC answers that the tort claims advanced by the attempted amendment are barred by section 2680(h) of the Federal Tort Claims Act, which excludes recovery for "[a]ny claim arising out of ... misrepresentation [or] deceit." Additionally, it argues that the rule limiting estoppel of the government precludes the promissory estoppel claim against the FDIC.

#### 1. *Sovereign Immunity*

##### i) *The Federal Tort Claims Act*

■ The FDIC is an instrumentality and agency of the United States and can-

not be sued absent a waiver of sovereign immunity. The Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.* (which governs in this case) does waive the defense of sovereign immunity for certain torts committed by government employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). However, section 2680(h) of the FTCA expressly excludes from the waiver of sovereign immunity:

> Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, *misrepresentation, deceit,* or interference with contract rights.

28 U.S.C. § 2680(h) (emphasis added).

Bateman's proposed tort claims fall within section 2680(h). The claims for misrepresentation and deceit are expressly excepted from the waiver of sovereign immunity. *See Gertner v. FDIC,* 814 F.Supp. 177, 179 (D.Mass.1992) (holding that section 2680(h) "specifically bars an action against the United States for misrepresentation"); *FDIC v. diStefano,* 839 F.Supp. 110, 121 (D.R.I.1993) (concluding that a counterclaim for conspiracy to defraud against the FDIC was within section 2680(h) because that provision barred claims for misrepresentation and deceit). The exception also excludes Bateman's proposed claim for negligent misrepresentation. *United States v. Neustadt,* 366 U.S. 696, 702, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) (" § 2680(h) comprehends claims arising out of negligent, as well as willful, misrepresentation.").

Bateman nevertheless takes the position that section 2680(h) does not apply to the proposed claims even though they are entitled "misrepresentation." According to Bateman, the gravamen of his claims is that the FDIC personnel with whom he was negotiating reached an oral agreement with him but then failed to take the necessary steps to obtain CRC approval. This

"failure to act," Bateman argues, amounts to a breach of the implied covenant of good faith and fair dealing, which is a duty that is separate and apart from any duty to use care in communicating information. Therefore, relying on *Block v. Neal,* 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983), Bateman contends that the claims are actionable under the FTCA.

The argument is unpersuasive. *Block v. Neal* involved a negligence action against the government under the FTCA. A recipient of a government loan sued the government for defects she alleged were partly attributable to the failure of government employees properly to inspect and supervise the construction of her house. *Neal,* 460 U.S. at 290, 103 S.Ct. 1089. The Court held that because her negligence claim was based on the government's breach of a duty that was "distinct from any duty to use due care in communicating information," it was not a claim of "misrepresentation" within the meaning of section 2680(h). *Id.* at 297, 103 S.Ct. 1089. However, the Court noted that if the negligence claim had been premised upon misstatements by government officials, it would have been barred by the FTCA as a claim for negligent misrepresentation. *Id.* at 298, 103 S.Ct. 1089.

The distinction in *Block v. Neal* between a claim for negligent misrepresentation and an action based on another species of negligence does not save Bateman's proposed claims. The only allegations of negligence advanced in the proposed amendment are misstatements by FDIC employees. For example, Bateman complains that the FDIC employees failed to exercise due care when they told him that the FDIC had a "bona fide intention" of selling the Note to him. He also alleges negligence by Leal in representing to Bateman that Leal would present the agreements to the CRC and that CRC approval would be forthcoming. He fur-

ther claims that he suffered damages due to his reliance on these representations. A claim based on such allegations amounts to an assertion of "negligent misrepresentation" (as it is entitled in the proposed amendment). *See Neal,* 460 U.S. at 296, 103 S.Ct. 1089 ("[T]he essence of an action for misrepresentation . . . is the communication of information on which the recipient relies."); *Jimenez–Nieves v. United States,* 682 F.2d 1, 4 (1st Cir.1982) (holding that the essential element for determining whether or not a claim was a misrepresentation claim within the meaning of section 2680(h) was reliance by the plaintiff upon the false information).

■ Moreover, Bateman cannot transform his negligence claim into something other than negligent misrepresentation by characterizing it as a claim for breach of the implied covenant of good faith and fair dealing. A breach of the implied covenant of good faith and fair dealing does not give rise to a negligence action. The covenant is a fixture of contract law as to which the FTCA provides no waiver of sovereign immunity.[1]

■ To cap it all even if Bateman's claims were legally sufficient, the proposed amendment cannot be permitted because claims brought under the FTCA must be brought against the United States rather than against an individual agent or, as here, a federal agency. *See FDIC v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (discussing 28 U.S.C. § 2679(a)) ("[I]f a suit is 'cognizable' under § 1346(b) of the FTCA, the FTCA remedy is 'exclusive' and the federal agency cannot be sued 'in its own name,' despite the existence of a sue-and-sued clause.").

ii) *Waiver*

■ Bateman argues that the FDIC waived the government's sovereign immu-

---

1. To the extent that Bateman asserts an independent claim for breach of the implied covenant of good faith and fair dealing that

sounds in contract, as discussed below, that claim also fails as a matter of law.

nity when it sued Bateman in March 1999 for the interest due on the Note. The argument is without merit. It is true that when the United States sues it waives immunity as to compulsory counterclaims for recoupment even if those claims would ordinarily be barred by the FTCA. *United States v. Johnson*, 853 F.2d 619, 621 (8th Cir.1988); *see Bull v. United States*, 295 U.S. 247, 261, 55 S.Ct. 695, 79 L.Ed. 1421 (1935) ("A claim for recovery of money ... may be used by way of recoupment and credit in an action by the United States arising out of the same transaction."). However, that rule is inapplicable here. The FDIC's complaint in the March 1999 suit was voluntarily and effectively dismissed without prejudice by the FDIC before an answer was filed. While the voluntary dismissal precluded Bateman from asserting compulsory counterclaims, it does not follow that Bateman may assert those claims as a plaintiff in this suit, even assuming they might have been asserted as counterclaims in a suit by the FDIC against him. Indeed, the fact that the FDIC's earlier suit against him was dismissed voluntarily means that Bateman is in no different a position than if the suit had not been filed.

### 2. *Promissory Estoppel*

■ Bateman seeks to add a promissory estoppel claim against the FDIC based on Leal's alleged promises on behalf of the FDIC to sell the Note to Bateman. The Supreme Court has declined to adopt "a flat rule that estoppel may not in any circumstances run against the Government," *Heckler v. Community Health Servs. of Crawford County*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), and its decisions on this subject provide little guidance as to the circumstances in which such claims may lie. However, the decisions of the Courts of Appeals do specify that "an estoppel against the United States is not measured by the rules used for ordinary litigants," *Howell v. FDIC*, 986 F.2d 569, 575 (1st Cir.1993), and that "[a] private individual asserting estoppel

against the government has a very heavy burden to bear," *Jones v. Dept. of Health & Human Servs.*, 843 F.2d 851, 853 (5th Cir.1988).

The principle that estoppel claims against the government are disfavored has figured prominently in First Circuit opinions. For example, in *Howell v. FDIC*, the court emphasized "the general rule against estoppel of the government" in affirming the district court's refusal to allow an amendment adding a claim for promissory estoppel against the FDIC acting in its capacity as receiver. 986 F.2d at 575. Similarly, in *Phelps v. Federal Emergency Management Agency*, the court reversed a district court decision allowing the assertion of equitable estoppel against the FEMA despite the hardship visited upon the plaintiff. 785 F.2d 13, 17 (1st Cir. 1986). In so holding, the court noted that "the Supreme Court has never shown hospitality toward claims of estoppel against the Government." *Phelps*, 785 F.2d at 19.

In the present case, Bateman's proposed estoppel claim against the FDIC must be dismissed. First, even given the heavy burden a party bears in asserting estoppel against the government, Bateman fails to specify any reason for departing from the rule that estoppel claims do not ordinarily lie against the government.

Moreover, to allow Bateman's estoppel claim would enable him to make an end run around the FTCA. *See e.g. Office of Personnel Management v. Richmond*, 496 U.S. 414, 430, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (relying on the FTCA as an additional ground for disallowing an estoppel claim against the government because it "would nullify a congressional decision against authorization of the same class of claims"); *Howell*, 986 F.2d at 575 (citations omitted) (noting that it was "hard to imagine a less attractive case for creating a new judicial exception to the general rule against estoppel of the government" where permitting the claim "would be judicially to admit at the back door that which has

been legislatively turned away at the front door"). Despite the "estoppel" label, Bateman's claim is essentially for "misrepresentation" because it is premised upon Bateman's reliance upon erroneous information supplied by FDIC employees. However, as discussed above, the "misrepresentation" exception in the FTCA, 28 U.S.C. § 2680(h), specifically bars claims for misrepresentation. *See Gertner v. FDIC*, 814 F.Supp. at 179.

■ As if that were not enough, the plaintiff is further out of court because he has not alleged facts sufficient to invoke estoppel. It is settled that an estoppel claim against the government cannot be erected on the basis of oral representations by a government agent because reliance on such representations is not reasonable or appropriate. *Heckler*, 467 U.S. at 65, 104 S.Ct. 2218. Accordingly, Bateman's estoppel claim fails because any reliance by Bateman upon the oral representations of the FDIC credit specialist was unreasonable as a matter of law. *See FDIC v. Royal Park*, 2 F.3d 637, 641 (5th Cir.1993) (affirming rejection of the defendants' estoppel defense against the FDIC on the grounds that "reliance upon oral representations of government officials is unreasonable as a matter of law regardless of whether the representation is of fact or law").

\* \* \* \* \* \*

In sum, because the proposed claims fail as a matter of law, the motion for leave to amend is denied.

## B. *FDIC's Motion for Summary Judgment*

The FDIC moves for summary judgment dismissing the complaint. Relying on *Hachikian v. FDIC*, 96 F.3d 502 (1st Cir.1996), *abrogated by Hardemon v. City of Boston*, 144 F.3d 24 (1st Cir.1998), the FDIC contends that even assuming that Leal, on behalf of the FDIC, agreed to sell the Note back to Bateman, Bateman's contract-based claims fail as a matter of law

because Leal, as a credit specialist, did not have actual authority to enter into the alleged settlement agreements on the FDIC's behalf. The FDIC also argues that it is entitled to summary judgment on Bateman's claim for a declaration that "the purported endorsement in favor of the FDIC is without legal effect." According to the FDIC, the endorsement of the Note to the FDIC was valid because the Note was transferable under Article 3 of the Uniform Commercial Code, M.G.L. ch. 106, § 3–100 *et seq.* (repealed 1998), which was in effect in Massachusetts at the time of the making and endorsement of the Note.

Bateman responds that the FDIC takes an overly expansive view of *Hachikian* and challenges the applicability of *Hachikian* to the "special facts" of this case. According to Bateman, this case is distinct from *Hachikian* because there the plaintiff was seeking to settle or compromise an obligation, whereas here Bateman was seeking to repurchase a note. Bateman also argues that *Hachikian* is inapplicable to his claim for breach of the implied covenant of good faith and fair dealing. As for his declaratory judgment claim, Bateman contends that the FDIC's arguments on this issue are "largely immaterial" because the FDIC admitted in its answer to the complaint that the Note is "non-negotiable."

### 1. *Breach of Contract*

■ The First Circuit's decision in *Hachikian*, 96 F.3d at 502, mandates granting summary judgment in favor of the FDIC on Bateman's contract-based claims. There, the plaintiff sued the FDIC alleging that an agreement he had reached with an FDIC account officer to settle all of his obligations to a failed bank was binding on the FDIC. *Id.* at 504. While acknowledging that the FDIC Credit Review Committee had not approved the settlement and that approval was ordinarily required, he contended that the agreement was nevertheless enforceable because the FDIC account officer had told him that Credit

Review Committee approval had been obtained. *Id.* at 505. The First Circuit, referring to the rule that a party seeking to recover in contract against the United States must show that the agent who purported to bind the government had actual authority to do so, rejected the plaintiff's argument. *Id.* (citing *Rock Island, Ark. & La. R.R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920) and *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989)). Based on the documentary evidence submitted by the FDIC, the court held that only the FDIC's Credit Review Committee (and not the FDIC account officer) had the authority to approve the settlements in question. *Id.* Because there was no evidence that the Credit Review Committee had approved the agreement, the court concluded that "no reasonable factfinder could conclude that the purported agreement ... ever materialized." *Id.*

The documentary evidence submitted by the FDIC in the case at hand is similarly dispositive. The "Delegations of Authority," promulgated by the FDIC's Board of Directors, authorizes various committees and officials to conduct and expend funds on behalf of the FDIC for asset management and disposition. By its terms, the authority "to compromise any asset ... or approve settlement ... concerning any asset" with a book value of $25 million or less rests solely with the Committee on Liquidations, Loans and Purchases of Assets (also known as the Credit Review Committee). Nothing in the "Delegations of Authority" supports the claim that Leal, as a credit specialist, had the authority to enter into agreements on the FDIC's behalf. Since there is no evidence that any of the agreements Bateman alleges to have reached with Leal were ever approved by the Credit Review Committee, those agreements never became legally effective or binding on the FDIC.[2] Moreover, even if Bateman did not know that CRC approv-

al was required, it does not affect Leal's lack of authority to enter into a binding agreement on behalf of the FDIC. *See Federal Crop Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947) ("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.").

Bateman's argument that *Hachikian* is not controlling here, because he, Bateman, was merely attempting to repurchase the Note, rather than settle or compromise it (as in Hachikian's case), is unpersuasive. The evidence establishes that the purpose of Bateman's negotiations with the FDIC was to settle his obligations under the Note. The letters drafted by Peppers, Bateman's attorney, submitted by Bateman in support of his claim, characterize the negotiations as "settlement" negotiations. That Bateman's largest offer for the Note, which had a face value of $1.68 million, was $521,661 further undermines his contention that he was seeking to repurchase the note rather than settle it.

### 2. *Implied Covenant of Good–Faith and Fair Dealing*

Bateman's claim for breach of the covenant of good-faith and fair dealing also fails as a matter of law. "[T]o show breach of the covenant, the plaintiff must show that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *Laser Labs, Inc. v. ETL Testing Labs., Inc.,* 29 F.Supp.2d 21, 24 (D.Mass.1998) (internal citations and quotation marks omitted). It follows that, since no enforceable contract to repurchase, compromise or settle the Note ever materialized, Bateman has no claim for

---

**2.** In fact, the evidence in this case weighs even more strongly against the plaintiff than was true in *Hachikian.* Unlike *Hachikian,*

there is no evidence here that Bateman was told that the CRC had approved the agreements.

breach of the implied covenant of good faith and fair dealing. *See Levenson v. LMI Realty Corp.*, 31 Mass.App.Ct. 127, 131, 575 N.E.2d 370 (1991) (concluding that the implied covenant of good faith and fair dealing did not apply because the parties had not reached a binding contract).

Furthermore, to the extent the obligations of good faith and fair dealing can be implied from the existence of the Note itself, the claim nevertheless fails because the obligations extend only to the parties' duty to perform their specific obligations under the contract. *See Badgett v. Security State Bank*, 116 Wash.2d 563, 570, 807 P.2d 356 (1991) (citations omitted) ("The duty to cooperate exists only in relation to performance of a specific contract term. As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms.").

### 3. *Declaratory Judgment*

The FDIC is also entitled to summary judgment on the plaintiff's declaratory judgment claim. In this count, Bateman seeks a declaration "that the Note is non-negotiable and the endorsement to the FDIC is without legal effect." Bateman makes much of the fact that the FDIC, in its answer to the complaint, admits that the Note is "non-negotiable," and mistakenly argues that the FDIC's admission is fatal to the FDIC's motion for summary judgment. The question raised by the FDIC is not whether the Note was "negotiable," but whether the transfer to the FDIC was "without legal effect."

Article 3 of the Uniform Commercial Code sets forth the rules governing negotiable instruments. Under the version in effect in Massachusetts at the time of the making and the endorsement of the Note, for a writing to qualify as a negotiable instrument, it must:

    (a) be signed by the maker or drawer; and

    (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article; and

    (c) be payable on demand or at a definite time; and

    (d) be payable to order or to bearer.

M.G.L. ch. 106, § 3–104 (repealed 1998). If an instrument meets all of these requirements, except for the words "to order or to bearer," it nevertheless does not fall outside the scope of Article 3. Section 3–805 provides that:

> [Article 3] applies to any instrument whose terms do not preclude transfer and which is otherwise negotiable within [Article 3] but which is not payable to order or to bearer, except that there can be no holder in due course of such an instrument.

M.G.L. ch. 106, § 3–805 (repealed 1998). Thus, under this provision, a promissory note that is not payable "to order" or "to bearer" is non-negotiable only to the extent that there can be no holder in due course of that note. *In re McMeekin*, 16 B.R. 805, 808 (Bankr.D.Mass.1982). However, if the terms of the instrument "do not preclude transfer" and the instrument is "otherwise negotiable within [Article 3]," the rules in Article 3 governing negotiable instruments are applicable.

██ Article 3 compels the conclusion that the endorsement of the Note to the FDIC was valid. Although the Note does not contain the words, "to order" or "to bearer," but is payable to Spring Realty Trust, it nevertheless is governed by Article 3 because its terms do not state that it is not transferable. Since all instruments encompassed by Article 3 may be transferred pursuant to former section 3–301, which authorizes the "holder of an instrument whether or not he is the owner ... [to] transfer or negotiate it," it follows that the Note was transferable. Bateman's claim for a declaratory judgment that the

Note to the FDIC was without legal effect is dismissed and the FDIC's motion for summary judgment is granted.

## C. FDIC's Motion for Sanctions

The FDIC moves for Rule 11 sanctions against Bateman and his attorney for the filing of the complaint and the motion to amend the complaint. Rule 11 sanctions are appropriate if papers filed with the court contain factual allegations that have no evidentiary support or advance legal arguments that are not warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. *See* Fed.R.Civ.P. 11(b)(3) and (2). The inquiry is an objective one.

■■■ The FDIC argues that sanctions are warranted in this case because there is no legal or factual basis for the plaintiff's claims premised on the alleged settlement agreements. Specifically, the FDIC asserts that the letters from Peppers, Bateman's attorney, to the FDIC, which Bateman alleges "confirmed" the existence of the agreements, actually reveal that Bateman knew that CRC approval was required before the agreements would become binding on the FDIC and that the alleged agreements were never approved by the CRC. The FDIC further asserts that the legal claims in the complaint and the proposed amended complaint violate Rule 11 because they are precluded by First Circuit case law and the Federal Tort Claims Act.

Bateman's legal and factual claims are not so plainly unmeritorious as to justify the imposition of sanctions. The factual allegations underlying the claims premised on the settlement agreements have an adequate basis in the record. While the letters from Peppers to the FDIC arguably are not "confirmations" of oral agreements, they nevertheless indicate that Leal, on the FDIC's behalf, offered to sell the Note back to Bateman at a specific price and that Bateman agreed to that price. Moreover, in contrast with the cases cited by the FDIC, there is no evidence of bad-faith or extreme carelessness in connection with these assertions. *See e.g., Levine v. FDIC*, 2 F.3d 476, 478–79 (2d Cir.1993) (affirming grant of Rule 11 motion where affidavit "substantially contradicted in many material respects" the testimony plaintiff provided in a prior deposition); *Aviation Constructors v. Federal Express Corp.*, 814 F.Supp. 710, 716 (N.D.Ill.1993) (awarding Rule 11 sanctions where "defendant intentionally concealed" evidence damaging to its counterclaims).

Furthermore, while Bateman's legal arguments do not prevail, they cannot fairly be characterized as frivolous. *See e.g., FDIC v. Calhoun*, 34 F.3d 1291, 1298 (5th Cir.1994) (reversing sanctions order when the attempted analogy to a line of cases failed to persuade but nonetheless constituted a good-faith argument to extend the law); *Thompson v. Duke*, 940 F.2d 192, 196–97 (7th Cir.1991) (reversing sanctions order when party could argue plausibly, though unsuccessfully, that his claim was distinguishable from other cases or could mount a good-faith argument for modification of existing case law).

The FDIC's motion for sanctions is denied.

## III.

The plaintiff's motion to amend the complaint is denied on grounds of futility. The FDIC's motion for summary judgment dismissing the complaint is granted. The FDIC's motion for sanctions is denied.

It is so ordered.